IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 34176-3-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| RICHARD GARCIA, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Richard Garcia appeals his convictions for second degree assault, felony harassment, and second degree unlawful possession of a firearm. He argues (1) defense counsel rendered ineffective assistance of counsel by failing to object to a mid-trial recess, (2) the State's information was constitutionally defective because it failed to allege essential elements of felony harassment and unlawful possession of a firearm, (3) the trial court erred in imposing several community custody conditions, (4) the trial court failed to enter written findings of fact and conclusions of law setting forth its reasons for imposing a sentence above the standard range, and (5) the judgment and sentence contains a scrivener's error relating to his felony harassment sentence.

We disagree with Mr. Garcia's argument that defense counsel rendered ineffective assistance, and disagree that the count in the information charging him with unlawful possession of a firearm was constitutionally deficient. We do agree the count charging him with harassment was constitutionally deficient and with his remaining contentions.

Accordingly, we affirm Mr. Garcia's convictions for second degree assault and second degree unlawful possession of a firearm. We reverse his conviction for felony harassment and dismiss this charge without prejudice to the right of the State to recharge. We also remand for the trial court to enter written findings and conclusions supporting the exceptional sentence and to strike some and amend one of the challenged community custody conditions.

## FACTS

Mr. Garcia and his wife, April,[1] lived together in Cle Elum, Washington. They had three children together, ages seven, six, and two, and April also had three other children from another marriage. In September 2015, April's mother was visiting the family from out of town. On the night of September 21, April and her mother were having dinner at a local restaurant. Mr. Garcia arrived at the restaurant and was upset at April for having dinner without permission. April's mother asked him to leave so they could spend time together.

---

[1] We use April Garcia's first name for clarity.

2

The next day, April was home with their children. Mr. Garcia came home from work and was upset at April for having gone to dinner the night before. He stated April was an unfit parent and the two began arguing. As they argued, Mr. Garcia led their children into the children's bedroom. Mr. Garcia and April went to their bedroom.

Mr. Garcia then grabbed a pistol from a red backpack that was on a shelf in their closet. Mr. Garcia pointed the pistol at April's head.

He shouted that he would "blow [her] brains out," and that she would "never see [her] kids again." Report of Proceedings (RP) at 365. He also shouted, "'You will die, bitch.'" RP at 447. As this was happening, their seven-year-old daughter came around the corner and saw Mr. Garcia pointing the gun at April's head. April took their daughter back to the other room.

April then went into a hall bathroom, turned on the shower so Mr. Garcia could not hear her, and called her mother. April told her mother about the incident. Her mother left work and went to a police station. While there, she approached Officer Jennifer Rogers and told her what happened. The two then drove together to April and Mr. Garcia's house.

When they arrived, April was visibly shaken up and was crying hysterically. April told Officer Rogers about the incident. April led Officer Rogers into the bedroom, pointed to the closet where Mr. Garcia had gotten the pistol, and told Officer Rogers the

pistol was in the red backpack. Officer Rogers took the pistol from the red backpack and unloaded it. She took it with her to the police station, and it was later sent to the Washington State Patrol Crime Laboratory for deoxyribonucleic acid (DNA) testing. A forensic scientist determined Mr. Garcia's DNA was on the pistol.

Shortly after the incident, April's mother helped April move to Oregon.

PROCEDURE

On September 25, 2015, the State charged Mr. Garcia with first degree assault, felony harassment, and first degree unlawful possession of a firearm. The State included special allegations that Mr. Garcia was armed with a firearm when he committed the assault and that the assault constituted an aggravated domestic violence offense.

Mr. Garcia was arraigned and appointed counsel. Trial was set for November 17 and then reset for December 1. On November 18, the State filed its amended witness list, which listed April as a trial witness.

Trial commenced as scheduled December 1. At the beginning of the proceedings, the prosecutor informed the trial court that April was unavailable as a witness and the State would not be calling her. The prosecutor stated he had attempted to secure her presence but had reached a point where further efforts were futile. He informed the trial court he would not seek a material witness warrant to avoid disrupting April's and the

4

children's lives. Instead, he advised the State would prove its case through April's mother, April's neighbor, Officer Rogers, and two forensic scientists.

The State moved in limine to admit the statements April gave to Officer Rogers immediately after Officer Rogers arrived at the house. The State argued these statements were admissible under the excited utterance and state of mind hearsay exceptions. Over Mr. Garcia's objection, the trial court admitted April's hearsay statements under the excited utterance exception.

The State then discussed how it would prove that Mr. Garcia had been convicted of a "serious offense" for purposes of first degree unlawful possession of a firearm. The State indicated that Mr. Garcia had an Oregon conviction for third degree robbery. However, the trial court ruled Mr. Garcia's third degree robbery conviction was not comparable to a "serious offense" in Washington.

The State then indicated it would later amend the information to charge Mr. Garcia with second degree unlawful possession of a firearm, instead of first degree unlawful possession. The State further indicated the felony harassment charge would stay the same, and that it would ultimately seek a lesser included instruction of second degree assault. The jury was then seated and sworn. This first day of trial ended without any witnesses being called.

5

At the beginning of the second day of trial, the trial court asked the State to describe its efforts to secure April as a witness. The prosecutor stated that because April was currently in an unknown out-of-state location, he had not attempted to subpoena her.

The prosecutor then gave the following account to the trial court, explaining what had happened: The victim coordinator had contacted April in the days following the incident, but April then immediately moved out of her home in Cle Elum and went to Oregon. After that, the State was unable to contact her—her voicemail was either not set up, full, or she would not return the State's messages. In the weeks leading up to trial, the prosecutor personally began reaching out to April. He obtained April's e-mail address, and sent her at least three e-mails asking for her help. April responded to one of these. April seemed "upbeat" and had a good conversation with the prosecutor. RP at 111. She did not specify where she was, but said she was in Oregon. She seemed reluctant to appear as a witness and asked if the State could proceed without her, and the prosecutor explained the State needed her to prove its case. During this conversation, the prosecutor explained that April would need to come up from Oregon the day before trial and also explained someone would pick her up and arrange a hotel for her. April did not indicate she would not appear. This all occurred before the original November 17 trial date.

This was the last the prosecutor heard from April. After that, the prosecutor e-mailed April to inform her the trial had been reset for December 1. April did not return his e-mails, and her voicemail was either full or not set up. The prosecutor had Officer Rogers call April as well, but this was also unsuccessful. The prosecutor then arranged for an Oregon police officer to locate April. This officer was able to find one of April's sons, but not her. The prosecutor, Officer Rogers, and the victim coordinator all called April's mother, who lived in Arizona. They determined April would be more likely to appear if her mother was also a witness. They booked an airplane ticket for April's mother to fly up from Arizona. The day before trial, April's mother told the prosecutor that April had not been responding to her phone calls, text messages, or voicemails. At this point, the prosecutor determined the State would need to proceed without April. Throughout the course of his attempt to secure April as a witness, the prosecutor stayed in communication with defense counsel and provided updates as to his progress.

The prosecutor then explained to the trial court why the State had not requested a material witness warrant. He explained that because April moved to Oregon, the State would need to request a warrant from a Washington court, have that warrant recognized by an Oregon court, and then have an Oregon police officer arrest April and bring her to the border. The prosecutor further explained that he did not want to further traumatize

April and her children by putting them through this, so he decided to try the case without their testimony.

The trial court then revisited its prior ruling admitting April's hearsay statements to Officer Rogers. The trial court found that the emergency was no longer ongoing when April gave her statements to Officer Rogers at the house, that they therefore were not excited utterances, and that introducing these statements would violate the confrontation clause. The trial court then reversed its prior ruling and concluded that April's statements to Officer Rogers were inadmissible.

The prosecutor acknowledged that without these hearsay statements, the State would be unable to prove first degree assault and felony harassment. Defense counsel stated the defense's theory of the case was that April and her mother formulated a plan to allow April to move to Oregon, and stated that he believed the case was highly defensible.

The trial court reiterated that April's statements to Officer Rogers were inadmissible. However, the trial court indicated it would sign material witness warrants for April and the children. The State indicated it would call the witnesses it had available and then seek to continue the trial for good cause based on the warrants and its efforts to obtain April as a witness.

The State then called Officer Rogers, April's mother, Mr. Garcia's neighbor, and its two forensic scientists from the Washington State Patrol Crime Laboratory. Following these testimonies, the State moved the court to issue material witness warrants for April, her 7-year-old daughter, and her 16-year-old daughter from her prior marriage. The State then moved for a two week recess in the trial to allow it to secure April and her daughters.

The trial court asked defense counsel if he had a position on this course of action, and asked if it would prejudice the defense's case. Defense counsel stated:

> [F]rom my perspective I'm—I'm much more comfortable trying this case with her here. It's—that's just the legal position and the triability of—of the case—just makes it more preferable just for—that's just me.
> I'd agree with the judge's finding that you can't legally find Ms. Garcia unavailable. And I—I don't find any fault with [the prosecutor's] analysis.

RP at 297. The parties agreed to resume trial on December 15, 2015.

The State then indicated it was amending the information. The amended information added "some additional language" to the first degree assault charge. RP at 299. The State also amended the count charging first degree unlawful possession of a firearm to charge second degree unlawful possession of a firearm. Mr. Garcia was arraigned and waived formal reading of the amended information. The amended information was never filed with the clerk and is, therefore, not part of the record.

9

The trial court then signed the orders directing the clerk to issue material witness warrants for April, her 7-year-old daughter, and her 16-year-old daughter. Defense counsel asked the court to allow him to interview April and her daughters sufficiently before trial resumed, and the State agreed it would make the witnesses available.

The State commenced the process to have the warrants executed in Oregon. April and her daughters were eventually located in Oregon, and Officer Rogers accompanied them back to Washington.

Trial recommenced as scheduled on December 15. April testified that Mr. Garcia held the pistol to her head and threatened to shoot her. The seven-year-old daughter testified that she saw this occur.

The next morning, the State indicated it needed to file a second amended information. The prosecutor put a copy on the bench and provided a copy to defense counsel. The prosecutor stated the changes were "not substantive," but rather "syntax errors." RP at 537. The first amended information had referenced first degree unlawful possession in the summary portion, so the prosecutor edited it to reflect that the State was charging second degree unlawful possession. The prosecutor also inserted the word "felony" before "harassment," to distinguish it from misdemeanor harassment. RP at 537-38. The prosecutor also deleted the reference to "Kittitas County" as the venue. RP at 538. The defense agreed these were the only changes. Mr. Garcia was arraigned and

10

waived formal reading of the second amended information. The second amended information was never filed with the clerk and is not part of the record.

The jury was unable to reach a verdict on first degree assault, but found Mr. Garcia guilty of second degree assault. The jury also found Mr. Garcia guilty of felony harassment and second degree unlawful possession of a firearm. The jury also returned the special verdicts finding that Mr. Garcia was armed with a firearm when he committed the assault and that the assault constituted an aggravated domestic violence offense.

A community corrections officer completed a risk assessment report prior to sentencing. The report documented Mr. Garcia's history with methamphetamine. It stated Mr. Garcia had used methamphetamine twice a month between 2005 and 2012, and then became sober. It stated Mr. Garcia began using again in 2015 three weekends per month, but stopped one month prior to his arrest. The report also stated Mr. Garcia abused alcohol as a teenager, but successfully completed treatment in 1999. Based on this information, the community corrections officer recommended that Mr. Garcia undergo a substance abuse evaluation.

The trial court imposed 14 months' confinement for second degree assault. The court also imposed 36 months' confinement on the firearm enhancement, and an additional 10 months' confinement based on the jury's finding that the assault constituted

an aggravated domestic violence offense. The court did not enter written findings of fact and conclusions of law supporting the exceptional sentence.

The court also imposed 12 months' confinement for both felony harassment and second degree unlawful possession of a firearm. However, the judgment and sentence indicated Mr. Garcia's sentence for the felony harassment conviction was 12 days.

The court also imposed 18 months' community custody to follow Mr. Garcia's term of confinement. The court imposed a number of community custody conditions, including conditions requiring Mr. Garcia to undergo a substance abuse evaluation and comply with treatment, prohibiting him from entering establishments that primarily sell alcohol, and prohibiting him from going to areas where "dangerous drugs," narcotics, or controlled substances are sold, possessed, or consumed. Clerk's Papers (CP) at 27.

Mr. Garcia appeals.

## ANALYSIS

A.   ALLEGED INEFFECTIVE ASSISTANCE FOR FAILURE TO OBJECT TO CONTINUANCE

Mr. Garcia argues he received ineffective assistance because defense counsel failed to object to the State's request for the two week recess. He argues this recess allowed the State to secure April and her daughters as witnesses, without whom the State could have never proved the assault or harassment charges. He argues that if counsel had

12

objected, the trial would have continued without them and thus resulted in a dismissal of these two counts.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A defendant receives ineffective assistance if the attorney's conduct (1) falls below a minimum objective standard of reasonable attorney conduct, and (2) prejudices the defendant, i.e., there is a reasonable probability the attorney's conduct affected the case's outcome. *State v. Benn*, 120 Wn.2d 631, 663, 845 P.2d 289 (1993). Because ineffective assistance of counsel is an issue of constitutional magnitude, it may be considered for the first time on appeal. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Benn*, 120 Wn.2d at 665. Counsel also does not perform deficiently when he or she declines to raise a nonmeritorious argument at trial, given the argument's likelihood of failure. *See State v. Williams*, 152 Wn. App. 937, 944-45, 219 P.3d 978 (2009), *rev'd on other grounds*, 171 Wn.2d 474, 251 P.3d 877 (2011). This court reviews ineffective assistance claims de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

13

A trial court has discretion in determining whether to grant a recess to allow a party to secure or consult with additional witnesses. *See State v. Edwards*, 68 Wn.2d 246, 255, 412 P.2d 747 (1966); *State v. Delarosa-Flores*, 59 Wn. App. 514, 516, 799 P.2d 736 (1990). "Good faith is, of course, an essential ingredient to any application for a recess, postponement or continuance, and for the issuance of process." *Edwards*, 68 Wn.2d at 258. Factors to consider are whether the recess is designed to delay, harry, or obstruct the orderly process of the trial, or to take the opposing party by surprise. *Id.* In *Edwards*, our Supreme Court held the trial court abused its discretion by denying the defendant's good faith request for a recess to enable him to compel witnesses he had properly subpoenaed. *Id.*

In light of the applicable law governing requests for trial recesses, Mr. Garcia cannot establish defense counsel performed deficiently. As discussed in detail above, the State made a good faith, diligent, and honest effort to secure April and her daughter as witnesses in the weeks leading up to trial. The prosecutor communicated with defense counsel and updated him regarding the State's progress. There is no evidence the prosecutor attempted to delay, harry, obstruct the orderly process of the trial, or take Mr. Garcia by surprise. Based on the applicable law governing recesses, defense counsel likely knew that even if he had objected, the trial court would have granted the State's request over his objection.

14

Nevertheless, Mr. Garcia argues defense counsel should have objected to the recess because the State's request was based on the unavailability of witnesses it never subpoenaed. In the speedy trial context, Washington courts have consistently held that the failure to properly subpoena a witness constitutes a lack of due diligence. *See State v. Adamski*, 111 Wn.2d 574, 578-79, 761 P.2d 621 (1988); *City of Kirkland v. Ellis*, 82 Wn. App. 819, 830, 920 P.2d 206 (1996).

Mr. Garcia argues the same due diligence analysis should apply here. But his argument ignores the critical distinction between a pretrial continuance that results in a trial starting after the CrR 3.3 speedy trial deadline and a recess after trial has already commenced. Where CrR 3.3 is violated, a defendant is not required to show prejudice to obtain a dismissal. *E.g.*, *State v. Teems*, 89 Wn. App. 385, 388, 948 P.2d 1336 (1997). Conversely, a trial court's discretionary decision to grant a recess during a trial, which does not implicate the rule, will be disturbed only on a showing of prejudice. *See Edwards*, 68 Wn.2d at 257. Mr. Garcia cites no Washington authority for the proposition that a CrR 3.3 analysis should apply to a recess requested during trial.

Mr. Garcia argues he was prejudiced by the recess because without it, the State would never have been able to prove its assault or harassment charges and the trial court would have been required to dismiss them. This argument misconstrues the meaning of "prejudice." Prejudice, in this context, does not mean contributing to a conviction. If it

did, then every continuance or recess that helps the State would be prohibited. Prejudice means *unfairly* or *unjustly* contributing to a conviction. *State v. Day*, 51 Wn. App. 544, 549-50, 754 P.2d 1021 (1988). The two week continuance was neither unfair nor unjust. For instance, the recess did not cause Mr. Garcia's evidence to spoil, cause his witnesses to become unavailable, or cause his constitutional rights (such as his right to a speedy trial) or any other right to be violated. Mr. Garcia contends he was prejudiced because he did not receive a windfall from April's reluctance to testify, but this is not the kind of prejudice that deprives a trial court of discretion to grant a recess.

Applying the strong presumption that counsel has rendered adequate assistance, together with the fact that controlling authority supports the trial court's decision to grant the recess, we conclude that Mr. Garcia has failed to demonstrate that defense counsel performed deficiently by not objecting to the recess. Accordingly, we conclude Mr. Garcia did not receive ineffective assistance of counsel.

B.    CONSTITUTIONAL SUFFICIENCY OF THE INFORMATION

Mr. Garcia argues the information was constitutionally defective because it failed to allege all the essential elements of felony harassment and unlawful possession of a firearm.

16

1.    *Missing amended information and second amended information*

The central issue with respect to Mr. Garcia's challenge to the charging document is the question of whether this court should evaluate the sufficiency of the original information, given that there is no written record of the amended information or the second amended information.

The State concedes that neither the amended information nor the second amended information are in the trial court file. However, the State argues that Mr. Garcia was tried on the second amended information—not the original information. Thus, it argues, *he* had the burden of designating this document for this court's review and, because he did not do so, the record is insufficient for this court to review his challenge to the constitutional sufficiency of that document.

The State's argument is unpersuasive. The State moved to amend the information and, thus, *it* had the burden to ensure its own pleading was properly filed. *See* CrR 2.1. On this record, there is no evidence the amended information or second amended information were ever actually filed.

Moreover, the parties indicated on the record the exact nature of the amendments to each information. The changes involved minor corrections such as changing syntax, removing Kittitas County as a venue, and correcting the summary portion of the information. The parties made a detailed record of the amendments to the information,

17

and the record does not reflect that the State ever amended the language to correct any missing elements. We, therefore, will review the original information and presume that the elements stated therein were stated in the same manner in the second amended information.

> 2.     *Merits of Mr. Garcia's challenge to the constitutional sufficiency of the information*

Criminal defendants have the constitutional right to know "the nature and cause of the accusation" against them. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. To be constitutionally sufficient, a charging document must include all essential elements of a crime, statutory and nonstatutory, so as to inform a criminal defendant of the charges and to allow the defendant to prepare a defense. *State v. Kjorsvik*, 117 Wn.2d 93, 102, 812 P.2d 86 (1991). A charging document that omits an essential element of the charged crime is constitutionally defective and must be dismissed without prejudice. *State v. Johnson*, 180 Wn.2d 295, 300-01, 325 P.3d 135 (2014). "An 'essential element is one whose specification is necessary to establish the very illegality of the behavior' charged." *State v. Zillyette*, 178 Wn.2d 153, 158, 307 P.3d 712 (2013) (internal quotation marks omitted) (quoting *State v. Ward*, 148 Wn.2d 803, 811, 64 P.3d 640 (2003)). This court reviews the constitutional adequacy of a charging document de novo. *State v. Goss*, 186 Wn.2d 372, 376, 378 P.3d 154 (2016).

18

When the defendant challenges a charging document for the first time on appeal, the appellate court will liberally construe it in favor of validity. *Kjorsvik*, 117 Wn.2d at 102. Under the liberal standard, this court has "considerable leeway to imply the necessary allegations from the language of the charging document." *Id.* at 104.

The liberal review standard employs the two-prong *Kjorsvik* test: (1) do the necessary elements appear in any form, or by fair construction can they be found, in the information, and if so (2) can the defendant nevertheless show he or she was actually prejudiced by the unartful language. *Id.* at 105-06; *see also State v. Zillyette*, 173 Wn.2d 784, 786, 270 P.3d 589 (2012). If the necessary elements are not found or fairly implied on the face of the information, this court must presume prejudice and is required to reverse without reaching the question of prejudice. *Zillyette*, 173 Wn.2d at 786. If a court does find all essential elements, the defendant is still entitled to reversal if he or she can show actual prejudice. *State v. Campbell*, 125 Wn.2d 797, 802, 888 P.2d 1185 (1995).

Under the first *Kjorsvik* prong, this court looks solely to the face of the charging document. *Kjorsvik*, 117 Wn.2d at 106. "Words in a charging document are read as a whole, construed according to common sense, and include facts which are necessarily implied." *Id.* at 109. A charging document satisfies the first prong if it includes the essential elements of the offense even if it does not contain the exact statutory language.

19

*State v. Hopper*, 118 Wn.2d 151, 156, 822 P.2d 775 (1992). "Even missing elements may be implied if the language supports such a result." *Id.* However, "[i]f the document cannot be construed to give notice of or to contain in some manner the essential elements of a crime, the most liberal reading cannot cure it." *Campbell*, 125 Wn.2d at 802.

### i.    *Unlawful possession of a firearm*

For unlawful possession of a firearm, Mr. Garcia argues the State did not allege the nonstatutory element that he *knowingly* possessed a firearm.

A person is guilty of unlawful possession of a firearm—either first or second degree—when "the person owns, has in his or her possession, or has in his or her control any firearm" and is subject to an enumerated disqualifying condition. RCW 9.41.040(1)(a), (2)(a).

Although RCW 9.41.040(1)(a) does not expressly include "knowledge" as an element of unlawful firearm possession, our Supreme Court has held that "knowledge" is an additional nonstatutory element that the State must prove beyond a reasonable doubt. *State v. Anderson*, 141 Wn.2d 357, 359, 5 P.3d 1247 (2000). Thus, although the statute does not require the defendant to have known that possessing a firearm was unlawful, it does require the defendant to have known that he or she actually possessed the firearm. *State v. Marcum*, 116 Wn. App. 526, 535, 66 P.3d 690 (2003). Accordingly, when the State charges a person with unlawful possession of a firearm, the knowledge element

20

must either appear in the body of the information, or the information must include language from which the knowledge element can be inferred. *Id.* "Simply to state that the offense charged is unlawful possession is not enough." *Id.*

Here, the original information alleged:

That on or about September 22, 2015 in Kittitas County, Washington, the defendant, Richard Garcia, owned, had in his possession, or had in his control any firearm after having previously been convicted in this state or elsewhere of any serious offense, as defined in this chapter, thereby committing the felony crime of **UNLAWFUL POSSESSION OF A FIREARM IN THE FIRST DEGREE**, in violation of RCW 9.41.040(1)(a).

CP at 2.

In *Marcum*, this court held that a substantively identical charging document was constitutionally insufficient, even under a liberal construction, because it omitted the essential element of knowledge.[2] *See Marcum*, 116 Wn. App. at 533, 535-36. The *Marcum* court acknowledged the language alleged the defendant "did own or have in his/her possession or control a firearm," but found this could not conceivably be

---

[2] There, the information alleged:
JARED MARCUM
of the crime(s) of: COUNT I: UNLAWFUL POSSESSION OF A
FIREARM IN THE FIRST DEGREE, RCW 9.41.040(1)(a); . . . committed
as follows, to-wit:
That [he] . . . did own or have in his/her possession or control a
firearm, to wit: [described] after having been convicted [of a serious
offense] . . . .
*Marcum*, 116 Wn. App. at 533 (alterations in original).

21

construed as charging knowledge. *Id.* at 535; *accord State v. O'Neal*, 126 Wn. App. 395, 415, 109 P.3d 429 (2005) (information alleging defendant had firearm "under his control" did not substitute for the "knowingly" element), *aff'd*, 159 Wn.2d 500, 150 P.3d 1121 (2007). Therefore, because the count charging Mr. Garcia with unlawful possession of a firearm was nearly identical to the one at issue in *Marcum*, it failed to allege the essential element of knowledge.

The State argues the "knowledge" element is present under the liberal standard because the information also charged Mr. Garcia with assault based on pointing a firearm at April, which would necessarily have required Mr. Garcia to know he possessed the firearm. The State's argument has merit.

When evaluating the sufficiency of the information under the liberal standard, this court may look at the other counts in the information to determine if the challenged count is constitutionally sufficient. *State v. Nonog*, 169 Wn.2d 220, 227, 237 P.3d 250 (2010). Here, count one of the information charged Mr. Garcia with first degree assault. It alleged that Mr. Garcia "pointed a firearm at April Garcia, thereby committing" first degree assault. CP at 1. Given these allegations, and construing the information liberally and according to common sense, the missing element that Mr. Garcia *knew* he possessed the gun can be fairly inferred here. The charging document, taken as a whole, adequately informed Mr. Garcia that he knowingly possessed the firearm.

22

Although the charging document alleged all of the essential elements, Mr. Garcia is still entitled to reversal if he can show he was actually prejudiced by the unartful language in the information. *Campbell*, 125 Wn.2d at 802. Here, Mr. Garcia makes no attempt to demonstrate he was prejudiced. *See* Br. of Appellant at 29. Nor could he. During pretrial motions, the State expressly discussed its burden to prove knowledge: "[O]ne of the essential elements is the knowledge element. He has to know. Knowingly possess the firearm." RP at 62. Accordingly, because the State's charging document informed Mr. Garcia of all the elements of unlawful possession of a firearm, we affirm this conviction.

### ii.    *Felony harassment*

For felony harassment, Mr. Garcia argues the State did not allege the essential element requiring April to have reasonably feared he would carry out his threat to kill.

The State charged Mr. Garcia with felony harassment under RCW 9A.46.020. That statute provides, in relevant part:

(1)  A person is guilty of harassment if:
    (a)  Without lawful authority, the person knowingly threatens:
    (i)  To cause bodily injury immediately or in the future to the person threatened or to any other person [and]
    . . . .
    (b)  The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out. . . .

23

[(2)](b) A person who harasses another . . . is guilty of a class C felony if
. . . (ii) the person harasses another person under subsection (1)(a)(i) of this
section by threatening to kill the person threatened . . . .

RCW 9A.46.020.

Here, the information alleged:

That on or about September 22, 2015, in Kittitas County, WA, the
defendant, Richard Garcia, without lawful authority, knowingly threatened
to cause bodily injury immediately or in the future to the person threatened,
to wit: threatened to kill April Garcia, thereby committing the felony crime
of **HARASSMENT**, in violation of RCW 9A.46.020(1)(a) and (2)(b)(ii).

CP at 2. The essential element requiring the threatened person to have reasonably feared

the defendant would carry out the threat to kill is completely absent.

Like before, the State argues the "reasonable fear" element is present under

the liberal standard because the information charged Mr. Garcia with assault based

on pointing a firearm at April, which would logically have placed her in

reasonable fear that his threat would be carried out.

However, for this particular charge, this argument stretches the inference too far.

Unlike with the knowledge element for possession of a firearm, it is too great of a factual

leap to conclude April was in reasonable fear of harm. This is because the question of

reasonable fear of harm depends on all the facts and circumstances of the threat. *State v.
C.G.*, 150 Wn.2d 604, 611, 80 P.3d 594 (2003). This question also often depends on

prior incidents between the defendant and the listener, such as whether the defendant has

24

made prior threats or acts of violence. *See State v. Ragin*, 94 Wn. App. 407, 411-12, 972 P.2d 519 (1999). In light of this authority, the allegation that Mr. Garcia pointed the firearm at April, even construed according to common sense, did not fairly inform him of the essential element that April was in reasonable fear that he would act on his threats. Thus, even "the most liberal reading cannot cure it." *Campbell*, 125 Wn.2d at 802. Because this element was missing entirely, Mr. Garcia need not show prejudice. *Zillyette*, 173 Wn.2d at 786.

We conclude the information was constitutionally sufficient as to the unlawful possession of a firearm charge, but defective as to the felony harassment charge. We, therefore, reverse Mr. Garcia's conviction for felony harassment and dismiss the charge without prejudice to the right of the State to recharge and retry either the same offense or any lesser included offense. *See State v. Vangerpen*, 125 Wn.2d 782, 791-95, 888 P.2d 1177 (1995).

C.    COMMUNITY CUSTODY CONDITIONS

Mr. Garcia challenges several of his community custody conditions. He argues conditions 5 and 10 are not crime related. He argues condition 8 is unconstitutionally vague. Defendants may challenge community custody conditions for the first time on appeal. *State v. Cordero*, 170 Wn. App. 351, 373, 284 P.3d 773 (2012).

25

This court reviews community custody conditions for an abuse of discretion. *State v. Irwin*, 191 Wn. App. 644, 652, 364 P.3d 830 (2015). The abuse of discretion standard applies whether this court is reviewing a crime-related community custody condition or reviewing a community custody condition for vagueness. *See id.* at 652, 656; *State v. Sanchez Valencia*, 169 Wn.2d 782, 791-92, 239 P.3d 1059 (2010) (vagueness); *Cordero*, 170 Wn. App. at 373 (crime related). Imposing an unconstitutional condition is always an abuse of discretion. *Irwin*, 191 Wn. App. at 652.

1.  *Condition number 5: Substance abuse evaluation and treatment*

Mr. Garcia challenges community custody condition 5, which requires him to obtain a substance abuse evaluation and comply with treatment. He argues, and the State concedes, that neither the evidence nor the trial court's findings established that substance abuse was related to his crimes.

A trial court lacks authority to impose a community custody condition unless authorized by the legislature. *State v. Warnock*, 174 Wn. App. 608, 611, 299 P.3d 1173 (2013). As part of any term of community custody, the court may impose and enforce crime-related prohibitions. RCW 9.94A.505(9); RCW 9.94A.703(3)(f). A crime-related condition prohibits conduct that "directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). The court may also require a defendant to participate in crime-related treatment, counseling services,

26

rehabilitative programs, or other "affirmative conduct reasonably related to the

circumstances of the offense, the offender's risk of reoffending, or the safety of the

community." RCW 9.94A.703(3)(c)-(d).

The Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW, authorizes the court

to order a defendant to obtain a chemical dependency evaluation and to comply with

recommended treatment only if it finds that the offender has a chemical dependency that

contributed to his or her offense:

> Where the court finds that the offender has any chemical dependency that
> has contributed to his or her offense, the court may, as a condition of the
> sentence and subject to available resources, order the offender to participate
> in rehabilitative programs or otherwise to perform affirmative conduct
> reasonably related to the circumstances of the crime for which the offender
> has been convicted and reasonably necessary or beneficial to the offender
> and the community in rehabilitating the offender.

RCW 9.94A.607(1); *see Warnock*, 174 Wn. App. at 609 (trial court may only impose

chemical dependency evaluation and treatment if it finds chemical dependency

contributed to offense). "If the court fails to make the required finding, it lacks statutory

authority to impose the condition." *Warnock*, 174 Wn. App. at 612.

Here, the trial court ordered Mr. Garcia to undergo substance abuse evaluation and

to comply with treatment as condition 5 of his community custody. The judgment and

sentence contained a provision for the court to find, under RCW 9.94A.607, that "[t]he

27

defendant has a chemical dependency that has contributed to the offense(s)." CP at 17. The trial court did not make this finding.

Condition 5 was also not authorized by RCW 9.94A.703(3)(c)-(d), which allows courts to impose crime-related treatment, counseling, rehabilitative programs, and other affirmative conduct. There was no evidence at trial or at sentencing that substance abuse or chemical dependency played a role in Mr. Garcia's offenses. April testified that Mr. Garcia did not, to her knowledge, have any problems with drug abuse. And although the risk assessment submitted for sentencing indicated Mr. Garcia used methamphetamine intermittently between 2005 and 2015, it also indicated he stopped one month before the crimes. The risk assessment did not relate Mr. Garcia's prior methamphetamine use to his crimes.

In the absence of evidence or a finding that substance abuse was directly related to the circumstances of Mr. Garcia's crimes, the trial court lacked authority to require substance abuse treatment as a community custody condition. *See Warnock*, 174 Wn. App. at 612. Accordingly, we accept the State's concession and remand for the trial court to strike condition 5.

28

2.      *Condition number 10: Prohibition on going to establishments where alcohol is the main revenue source*

Mr. Garcia challenges community custody condition 10, which prohibits him from entering establishments where alcohol is the main revenue source. He argues this condition is not crime related.

A trial court may prohibit any defendant from "possessing or consuming alcohol" as a condition of community custody, regardless of whether alcohol was crime related. RCW 9.94A.703(3)(e); *see State v. Jones*, 118 Wn. App. 199, 206-07, 76 P.3d 258 (2003). Although a trial court may always prohibit the possession and consumption of alcohol, the trial court here went a step further and prohibited Mr. Garcia from entering establishments where alcohol is the main revenue source.

The only evidence in the record relating to alcohol is that Mr. Garcia abused alcohol as a teenager, but successfully completed alcohol treatment in 1999. No evidence suggests alcohol was directly related to the circumstances of Mr. Garcia's crimes. Therefore, the condition prohibiting Mr. Garcia from entering establishments where alcohol is the main revenue source is not crime related. *See* RCW 9.94A.030(10), .703(3)(f); *Jones*, 118 Wn. App. at 207-08. Accordingly, the trial court lacked authority to impose condition 10 and we remand for the trial court to strike it.

29

3.      *Condition number 8: Prohibition on entering or remaining in areas
where controlled substances are sold, possessed, or consumed*

Mr. Garcia argues, and the State concedes, that condition 8 is unconstitutionally vague. Condition 8 states that Mr. Garcia "shall not enter into or remain in areas where dangerous drugs, narcotics, or controlled substances are being sold/purchased, possessed, and/or consumed." CP at 27.

Due process requires that laws not be vague. *Irwin*, 191 Wn. App. at 652. A community custody condition is not vague as long as it (1) provides ordinary people with fair warning of the proscribed conduct, and (2) has standards that are definite enough to "'protect against arbitrary enforcement.'" *Id.* at 652-53 (quoting *State v. Bahl*, 164 Wn.2d 739, 752-53, 193 P.3d 678 (2008)).

Importantly, in deciding whether a community custody condition is impermissibly vague, this court does not consider the terms in a vacuum. *Bahl*, 164 Wn.2d at 754. Rather, this court considers them in the context in which they are used. *Id.* If a person of ordinary intelligence can understand what conduct the condition prohibits, notwithstanding some possible areas of disagreement, the condition is not unconstitutionally vague. *Id.*

Mr. Garcia argues condition 8 could conceivably prohibit him from going to a hospital to visit a sick friend, going to a pharmacy to buy cough suppressant, or going to

30

a grocery store. While this argument has some merit, the problem is that it focuses on condition 8 in isolation. Condition 6 allows Mr. Garcia to purchase, possess, and consume dangerous drugs, narcotics, and controlled substances with a "valid prescription from a licensed physician." CP at 27. Condition 8 must be read as part of this broader condition. When the challenged language is read in context, ordinary people can understand what is prohibited.

However, we agree that, as worded, condition 8 is unclear. There is no precise distinction between "dangerous drugs," "narcotics," and "controlled substances." CP at 27. Moreover, Mr. Garcia could still conceivably violate condition 8 by entering a hospital, pharmacy, or grocery store without a valid prescription. Therefore, on remand, we instruct the trial court to amend condition 8 to read:

> (8)    Defendant shall not enter into or remain in areas where controlled substances are being ***unlawfully*** sold/purchased, possessed, and/or consumed.

D.    LACK OF FINDINGS AND CONCLUSIONS FOR EXCEPTIONAL SENTENCE

Mr. Garcia argues, and the State concedes, that the trial court failed to enter written findings of fact and conclusions of law setting forth its reasons for imposing a sentence above the standard range.

RCW 9.94A.535 governs exceptional sentences. It provides that "[w]henever a sentence outside the standard sentence range is imposed, the court shall set forth the

31

reasons for its decision in written findings of fact and conclusions of law." RCW 9.94A.535. This requirement is essential whenever a court imposes an exceptional sentence. *State v. Friedlund*, 182 Wn.2d 388, 393, 341 P.3d 280 (2015). An oral colloquy on the record does not satisfy this requirement. *Id.*

Here, the record does not contain findings and conclusions setting forth the trial court's reasons for imposing a sentence above the standard range. We remand the case for entry of those findings and conclusions. *Id.* at 395.

E.    APPELLATE COSTS

Mr. Garcia asks this court to waive appellate costs in the event the State prevails on appeal. He timely filed a report as to continued indigency in support of his request.

Generally, "the party that substantially prevails on review" will be awarded appellate costs, unless the court directs otherwise in its decision terminating review. RAP 14.2. "A 'prevailing party' is any party that receives some judgment in its favor." *Guillen v. Contreras*, 169 Wn.2d 769, 775, 238 P.3d 1168 (2010). "If neither party completely prevails, the court must decide which, if either, substantially prevailed." *Id.*

Here, the State prevailed on the first issue. Mr. Garcia partially prevailed on the second issue, and entirely prevailed on the third and fourth issues. Under such circumstances, we do not deem the State the substantially prevailing party and deny it an award of costs on appeal.

32

No. 34176-3-III
*State v. Garcia*

Affirmed in part, reversed in part, and remanded for entry of findings and conclusions relating to the exceptional sentence, and for striking and amending the community custody conditions.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Fearing, C.J.

Korsmo, J.